IN RE ESTATE OF LAURA M. NICHOLSON.
BLANCHE J. WILLY, APPELLANT, V. MARION POWERS
AND THE OMAHA NATIONAL BANK, PERSONAL
REPRESENTATIVES OF THE ESTATE OF LAURA M.
NICHOLSON, APPELLEES.

320 N.W.2d 739

Filed June 11, 1982. No. 44020.

Daniel J. Duffy and Ronald F. Krause of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

Larry E. Welch and Gary R. Batenhorst of Gross, Welch, Vinardi, Kauffman & Day, P.C., for appellees.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

HASTINGS, J.

The claimant, Blanche J. Willy, filed a claim in county court in the estate of Laura M. Nicholson, making claim to the entire estate, based on an alleged promise by the decedent to leave all of such estate to her. The claim was denied. An appeal was taken by the claimant to the District Court. The Omaha National Bank, a personal representative of the estate, filed a motion for summary judgment which was sustained, and the claimant's petition was ordered dismissed. This appeal followed.

The county court denied the claim on its merits. The District Court sustained the motion for summary judgment on the basis of two statutes, Neb. Rev. Stat. §§ 30-2351 and 30-2352 (Reissue 1979). Section 30-2351 provides as follows: "A contract to make a will or devise, or not to revoke a will or devise, or to die intestate, if executed after January 1, 1977, can be established only by (1) provisions of a will stating material provisions of the contract; (2) an express ref-

erence in a will to a contract and extrinsic evidence proving the terms of the contract; or (3) a writing signed by the decedent evidencing the contract. The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills.'' Assuming the application of that statute, there was no compliance with any of its terms. Section 30-2352 in pertinent part states: ''(a)(1) A person . . . who is [a] . . . devisee . . . under a testamentary . . . instrument . . . may renounce in whole . . . thereof, by filing a written instrument . . . (b) . . . within nine months after the death of the decedent . . . . The writing must be filed in the court of the county where proceedings concerning the decedent's estate are pending . . . .'' No such writing was filed by the claimant. Compliance with the statute is important only if the appellee Omaha National Bank is correct in its assertion that the law in Nebraska is such that one who is given a benefit under a will must choose between accepting such benefit and asserting some other claim that person has against the testator's estate. That is one of the questions which we must decide.

According to the testimony of Mrs. Willy in the record submitted, she was a nonregistered nurse who had been furnishing private nursing care to claimant's husband at an hourly rate of $3.50. A short time before his death on April 7, 1973, Mr. Nicholson secured a commitment from her to take care of Mrs. Nicholson in return for which she would be ''well taken care of.'' Further, according to Mrs. Willy, the decedent told her on many occasions from 1973 until into 1978 that she, the decedent, would ''keep track of everything and take care of you when I die.'' On later occasions, Mrs. Willy was told, ''Don't worry, I'm going to — I'm leaving you everything I have,'' and ''Blanche, you take care of me and I'll leave you everything I have.'' Finally, in response to questioning by the court, the claimant

agreed that the decedent had in effect told her that if she would stay with her until she died, she would leave her everything she had.

The "care" which Mrs. Willy furnished in line with her commitment, as she put it, varied, depending upon the state of Mrs. Nicholson's health. During the balance of 1973, and on into 1978, the claimant described Mrs. Nicholson's health as from good to excellent. However, according to the claimant, she was constantly doing things for Mrs. Nicholson during this time, such as grocery shopping, taking her to the hairdresser or downtown shopping "hundreds of times," or taking her on trips out of town for various meetings and other errands. Mrs. Willy estimated that she spent from 20 hours a week, beginning in 1973, to 40 hours a week with Mrs. Nicholson until 1978. As she put it, "I was at her beck and call."

It was in the early part of 1978, as testified to by Mrs. Willy, that Mrs. Nicholson's health undertook a dramatic change for the worse. That necessitated more intensive nursing care and some hospitalization. In fact, she claimed that she spent 24 hours per day with Mrs. Nicholson, "stayed with her around the clock." Nothing appears in the record which would serve to contradict the claims of Mrs. Willy as to the nature and extent of the services which she rendered.

Sometime in June of 1978, Mrs. Nicholson requested that the claimant start billing her for her nursing services. Mrs. Willy expressed surprise, as reflected by her testimony, in which she related that she said to Mrs. Nicholson, " 'Why, Laura, after what you have been saying to me,' that's all I said to her was, 'Why,' and all she says was that I wouldn't be able to work part-time . . . . I had to give her time and she felt that I needed money and she said that." In any event, Mrs. Willy did submit bills for her services relating back to April 21, 1978, and con-

tinuing through September 12, 1978, 2 days before decedent's death. The claimant was paid the total amount of those charges in the sum of $4,697.

By the terms of Mrs. Nicholson's will, there was bequeathed the sum of $5,000, plus a davenport, large chair and footstool, a secretary, twin beds, bedroom chest, and nightstand to "my friend Blanche J. Willy . . . in appreciation of all of the kind and helpful things she has done for me." The value of her entire estate was in excess of $300,000. Although the claimant has not accepted the $5,000, and in her petition on appeal offered to renounce the same, she has received the items of personal property. However, in her affidavit in opposition to the motion for summary judgment, she stated that she knew that the decedent was planning to give certain items of personal property to family members so that she, Mrs. Willy, "understood and interpreted Laura M. Nicholson's promise to excluding [sic] tangible personal property."

The claimant insists that § 30-2351 has no application to contracts entered into prior to January 1, 1977, and that the agreement formed with the Nicholsons dates back to the year 1973. Specifically, the statute applies only to those contracts *executed* after January 1, 1977. Therefore, it becomes necessary to define the term "executed." The claimant's position is that with regard to a parol contract, it is "executed" at the moment that mutual consent is manifested by the parties. The estate claims that executed means that the parties had entered into an agreement followed by sufficient performance so as to make it an enforceable contract. We believe that the latter definition is most nearly correct.

The case most nearly on point is *M. B. Kahn Const. Co. v. Crain et al.,* 222 S.C. 17, 71 S.E.2d 503 (1952). In that case, a state use and sales tax statute exempted the gross proceeds of sales of personal property "delivered prior to January 1, 1952, under

terms of construction contracts *executed* prior to April 1, 1951." (Emphasis supplied.) In construing that portion of the statute, the court said: "The meaning of the word 'executed', upon which the decision depends, is variable as is seen by the decisions in 15A Words and Phrases 235 *et seq.* . . . We think it was used in the present statute to designate the time when the contracting parties became bound, made or entered into an enforceable contract, as here; and not when they might later sign again in formal testimony of it. . . . Moreover, 'executed' as applied to a contract ordinarily means one which has been fully performed . . . . Patently, that was not intended by the legislature when it used the word in this instance." *Id.* at 20-21, 71 S.E.2d at 504.

In *Fire Ass'n of Philadelphia v. Ruby,* 60 Neb. 216, 82 N.W. 629 (1900), this court was called upon, in effect, to determine whether or not a petition which alleged that a bond had been "entered into" was equivalent to "executed" so as to include all formal acts such as signing, approval, and filing or delivery. We concluded that it was, and said: "The term 'entered into' is of common use in legal phraseology, has a well defined meaning, and is frequently found in statutes, opinions of courts, and legal publications generally. Ordinarily, it is equivalent to the phrase 'to become bound; or obligated by a bond, recognizance, contract,' etc. In the Century Dictionary the words 'To enter into recognizances' are defined thus: '[In law] to become bound under a penalty, by a written obligation before a court of record, to do a specific act.' . . . In the statutes of Nebraska the words 'entered into' appear to be used interchangeably with, and as equivalent to, the word 'execute.' " *Id.* at 220, 82 N.W. at 630-31.

We therefore conclude that an oral contract is "executed" at such time as the parties become bound to each other for the performance of the

terms of the agreement. The question now becomes whether the parties, the claimant and the decedent, arrived at any agreement which bound each to the performance of the terms thereof, and, if so, on what date did they become bound. However, on a motion for summary judgment, we do not determine how that issue is to be decided, but only whether or not there is a genuine issue as to any material fact in reference thereto. *Hanzlik v. Paustian, ante* p. 322, 318 N.W.2d 712 (1982).

Essentially, of course, the claimant is attempting to prove an oral contract whereby the decedent agreed to make a testamentary provision in consideration of services which were to be rendered to her by the claimant. "Such contracts are on their face void as within the statute of frauds, because not in writing, and, even though proved by clear and satisfactory evidence, they are not enforceable *unless there has been such performance as the law requires.*" (Emphasis supplied.) *Overlander v. Ware,* 102 Neb. 216, 217-18, 166 N.W. 611, 612 (1918). That case has been cited with approval by this court innumerable times, and as recently as in *Rudolph v. Hartung,* 202 Neb. 678, 277 N.W.2d 60 (1979), in which we said that although an oral agreement to make a will is unenforceable under the statute of frauds, the power of a court of equity to compel specific performance of agreements in cases of part performance remains in existence.

In *C. W. Hull Co. v. Marquette Cement Mfg. Co.,* 280 F. 260 (8th Cir. 1913), the court, in affirming the District Court for the District of Nebraska, concluded that whether the evidence of services rendered under an oral contract is sufficient to constitute part performance under the statute of frauds is a question of fact. See, also, *Hurley v. Manchester,* 107 Neb. 299, 185 N.W. 974 (1921).

"On a motion for summary judgment, the moving party bears the burden of proving that no genuine

issue as to any material fact exists and that he is entitled to judgment as a matter of law. The movant may discharge this burden of proof by a showing that if the case proceeded to trial his opponent could produce no competent evidence to support a contrary position." *Hanzlik v. Paustian, supra* at 328, 318 N.W.2d at 716. The preliminary material fact with which we are here concerned is whether sufficient part performance had been established to render the alleged oral agreement enforceable, and, if so, on what date this sufficient part performance was completed. If the evidence establishes the existence of such sufficient part performance prior to January 1, 1977, the requirements of § 30-2351 are not applicable. We do not believe that such a determination can be made as a matter of law in this instance, and that therefore a genuine issue of material fact exists in this respect.

Therefore, unless claimant's failure to renounce her bequest, in the manner provided for by § 30-2352, is fatal to her claim, the motion for summary judgment should not have been sustained.

Both parties cite *Cobb v. Macfarland,* 87 Neb. 408, 127 N.W. 377 (1910), as supportive of their positions. In that case the decedent owned 1,040 acres of land, consisting of two tracts, one of 800 acres, and the other of 240 acres. By decedent's will, plaintiff was devised a life estate in an undivided one-sixth of the entire 1,040 acres. By the action filed, the plaintiff claimed an oral contract with the decedent whereby in return for a gift of $16,000 to the decedent during his lifetime, he agreed to leave by his will to the plaintiff the entire 800-acre tract. During the course of the probate proceedings, the tract of 240 acres was sold and the plaintiff participated in the proceeds of the sale in accordance with the provisions of the will. In affirming the judgment of the trial court decreeing specific performance in favor of the plaintiff, this court acknowledged the fundamental

principle of law that one who accepts a beneficial interest under a will thereby adopts the whole will and renounces every right or claim that is inconsistent with the will. The court recognized the question before it to be whether the acts of acceptance or acquiescence of the property left by the will constituted an election so as to prohibit her from claiming under the alleged contract.

The court observed that although plaintiff attempted to take both the land given her by the will and the land she claimed under the alleged contract, upon advice of counsel, such actions were undertaken under a mistake as to her rights. However, this was not the reason for the decision. The court said: "[B]ut if it had been done purposely and intentionally it could not be said to be an election. An attempt to take one and reject the other is an election, but an attempt to take both cannot be said to be. [Citation omitted.] The plaintiff cannot be said to have elected to take her share of the proceeds of the sale of the 240-acre tract as given her by the will in lieu of her right to the other tract of land under her alleged contract, unless in taking the proceeds of the sale she acted in full knowledge of her rights and intended by that act to choose the one rather than the other." *Id.* at 413, 127 N.W. at 378-79. This court seemed to have said that it is only where the taking under the will is inconsistent with the claim under a contract that the one act constitutes an election in favor of one or the other. However, there is nothing inconsistent in making claim to the whole estate and at the same time accepting something less than the whole under the will. By the very nature of the claim, property comprising a bequest of only a part of the estate would be included within a claim to the entire estate. Such was the situation here, and the claimant was not required to make an election. Consequently, she had no reason to renounce the will under the terms of § 30-2352.

The motion for summary judgment should not have been granted. The judgment of the District Court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.