IN RE ESTATE OF LAYTON.
LESTER J. LUTZ AND WARD THOMPSON, COPERSONAL
REPRESENTATIVES OF THE ESTATE OF HARRY H.
LAYTON, DECEASED, APPELLANTS, V. JAMES C. EICH,
APPELLEE.
323 N.W.2d 817

Filed August 20, 1982.  No. 44361.

James T. Gleason, for appellants.

James B. Cavanagh of Erickson, Sederstrom, Leigh, Eisenstatt, Johnson, Kinnamon, Koukol & Fortune, P.C., for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

HASTINGS, J.

This is the second appearance of this action in this court. For a complete recitation of the facts, reference is made to the former opinion, reported at 207 Neb. 646, 300 N.W.2d 802 (1981). The case arises from the appellee's filing of what is purported to be a "claim" and an "amended claim" against the estate of Harry H. Layton. These documents allege that the decedent had promised the appellee during the last 10 years of the decedent's life that, in return for the appellee's long and faithful service, the decedent would execute a will leaving the appellee the inventory, the goodwill, the equipment, and the business building in which the Layton Hardware Store is located. In closing, the documents allege that the appellee "should receive the Layton Hardware Store business."

We determined in the initial appeal of this action that the Sarpy County District Court had erred in determining that the county court had not had juris-

diction over a matter of this nature. In so doing, we held that upon the filing of an intestacy proceeding in the county court, the county court acquires jurisdiction by law over all matters relating to the decedent's estate, including actions similar to the one filed in this case.

On remand, the action was tried to a jury in the District Court, resulting in a verdict for the appellee in the amount of $15,381.37 plus a requirement that the estate convey the building and lots upon which the Layton Hardware Store is located. The appellants perfected this appeal and assign as error the trial court's treatment of the jury verdict as dispositive rather than advisory; the trial court's failure to grant their motions for summary judgment, directed verdict, and judgment notwithstanding the verdict; the instructions the court submitted or refused to submit to the jury; the admittance of certain evidence; and the fact that the jury verdict is contrary to law and the evidence. We reverse.

The appellants' initial assignment of error arises from a dispute among the parties as to whether this action is legal or equitable in nature. As noted above, the appellee contends that he is entitled to and should be awarded the building, inventory, equipment, and goodwill of the Layton Hardware Store under the terms of an alleged oral promise made by the decedent that this property would be left to the appellee in the decedent's will. The appellants have interpreted such language to be a request for specific performance of an oral promise which, they contend, is an equitable action in which a jury verdict is advisory only and is not binding upon the District Court's disposition of the matter on appeal from the county court. On the other hand, the appellee characterizes this case as a common claim against an estate, which he contends is to be tried to a jury on appeal to the District Court under the provisions of Neb. Rev. Stat. §§ 30-1606 and 25-1104 (Reissue 1979).

We have long since decided this issue in *Peterson v. Estate of Bauer,* 76 Neb. 652, 107 N.W. 993 (1906), *aff'd* 76 Neb. 661, 111 N.W. 361 (1907). In that case a "claim" was filed against a decedent's estate alleging that the decedent was indebted to the claimant in the sum of $9,000, said debt arising out of services rendered for the decedent by the claimant for which the decedent had agreed to pay by devise or bequest to the claimant an amount not less than one-half of the decedent's entire estate at death. Upon the decedent's failure to make such a provision in his last will and testament, the claimant placed a value upon the estate of $18,000 and filed a claim requesting a judgment for one-half of that sum. The county court granted a judgment for $6,000, and the estate appealed to the District Court, where a jury returned a verdict for the estate.

Upon appeal of the matter, this court was called upon to discuss certain errors alleged to have arisen from the District Court's instruction to the jury. In doing so, the court noted that "The proceeding is in the form of an action at law, having originated in the district court in an appeal from an allowance by the county court of a money demand filed against the estate of the deceased, *but the nature of the claim, notwithstanding its form, is really and practically a suit to compel a specific performance of the alleged contract and like all such demands is addressed to the conscience of the trial judge sitting as a chancellor. The issue is one with which from its very nature and essence a court of law is incompetent to deal, and the present attempt to litigate it in such a tribunal is, so far as our information goes, without precedent. . . .* The suit is one to bind specifically the estate, real and personal, of the deceased with a contract alleged to have been made by him in his lifetime, which is confessedly void by positive statute both in form and in substance, but which it is contended that equity will nevertheless enforce for

the purpose of preventing fraud and doing exact justice. To such a suit the persons claiming title to the lands of the decedent as heirs or devisees, and asserting rights as distributees of the personalty by will or by statute, are indispensable parties without whose presence a final determination of the controversy cannot be made. It follows that such a claim is not litigable in the ordinary course of probate administration, but must be prosecuted, if at all, in a court of original and general equitable jurisdiction and powers, the executor or administrator being a proper but not in all instances a necessary party. . . . *It further follows that, when a jury is called in the trial of such a case, its functions are advisory only,* and the court cannot commit reversible error in the giving or refusal of instructions." (Emphasis supplied.) *Id.* at 659-60, 107 N.W. at 995-96. This language was adopted by the court on rehearing, with the following affirmation: "The conclusions of the former opinion that such an action as this, to appropriate one-half of the net value of the estate, should be in chancery, where all persons interested may be made parties, are sound and are adhered to." *Id.* at 665, 111 N.W. at 363.

It is readily apparent that the appellants have accurately characterized this action under *Peterson* as being equitable in nature, in spite of the fact that it is couched in the terms of a "claim" against the decedent's estate. Consequently, this action does not fall within that class of appeals from "the allowance or disallowance of claims filed against an estate," which are governed by § 25-1104, but rather falls within the final provision of § 30-1606, which provides that "all other appeals shall be triable to the court *as a suit in equity* in the manner provided in section 25-1105." (Emphasis supplied.) Neb. Rev. Stat. § 25-1105 (Reissue 1979) provides for a trial to the court "subject to its [the court's] power to order any issue or issues to be tried by a jury."

We have noted on prior occasions that the predecessors to § 25-1105 preserve the right of a court to submit a question of fact to a jury in an equitable action. *Alter v. Bank of Stockham,* 53 Neb. 223, 73 N.W. 667 (1897); *Omaha Fire Ins. Co. v. Thompson,* 50 Neb. 580, 70 N.W. 30 (1897). Therefore, it was not error for the District Court to submit the present action to a jury. However, as noted in *Peterson v. Estate of Bauer,* 76 Neb. 652, 660, 107 N.W. 993, 996 (1906), and a number of other cases, "when a jury is called in the trial of such a case, *its functions are advisory only* . . . ." (Emphasis supplied.) See, also, *Bank of Stockham v. Alter,* 61 Neb. 359, 85 N.W. 300 (1901); *Simmons v. Baker,* 109 Neb. 853, 192 N.W. 511 (1923); *Oft v. Dornacker,* 131 Neb. 644, 269 N.W. 418 (1936); *In re Guardianship of Warner,* 137 Neb. 25, 288 N.W. 39 (1939).

Upon reading the record of these proceedings, it becomes obvious that the District Court failed to treat the jury's findings as advisory only. At two points in the record the court noted that had it tried the case alone, it would have "come to a different conclusion." It was error under *Peterson, supra,* for the District Court to do so, and, consequently, the appellants' first assignment of error has merit. The effects of this error remain to be seen.

Our action in this appeal does not alter our opinion in the initial appeal of this matter and should not be interpreted as doing so. A county court still retains jurisdiction over matters of this nature following the filing of intestacy proceedings, in light of its authority to hear all matters relating to the decedent's estate. However, upon appeal of a case of this nature, wherein the underlying nature of the "claim" is to compel specific performance of an alleged contract entered into by the decedent, the matter is properly triable as a suit in equity in conformance with §§ 30-1606 and 25-1105.

In light of our decision to treat this action as an

equitable action to compel specific performance of a promise made by the decedent, we must hear and determine the matter de novo. Neb. Rev. Stat. § 25-1925 (Reissue 1979); *Cass v. Pense,* 155 Neb. 792, 54 N.W.2d 68 (1952); *Friehe Farms, Inc. v. Haberman,* 191 Neb. 292, 214 N.W.2d 916 (1974). We are also required to "reach an independent conclusion without being influenced by the findings of the trial court except to give weight to the fact that the trial court saw the witnesses and observed their demeanor while testifying . . . ." *Engel v. Rhen Marshall, Inc.,* 206 Neb. 265, 266, 292 N.W.2d 307, 308 (1980).

It is well established in this jurisdiction that " 'Where one is claiming the estate of a person deceased under an alleged oral contract, the evidence of such contract and the terms of it must be clear, satisfactory, and unequivocal.

" 'Such contracts are on their face void as within the statute of frauds, because not in writing, and, even though proved by clear and satisfactory evidence, they are not enforceable unless there has been such performance as the law requires.

" 'The thing done, constituting performance, must be such as is referable solely to the contract sought to be enforced, and not such as might be referable to some other and different contract—something that the claimant would not have done unless on account of the agreement and with the direct view to its performance—so that nonperformance by the other party would amount to fraud upon him.

" 'The burden in the light of this rule has devolved upon the plaintiff to prove (1) an oral contract the terms of which are clear, satisfactory, and unequivocal, and (2) that his acts constituting performance were such as were referable solely to the contract sought to be enforced, and not such as might have been referable to some other or different contract.' " *O'Neal v. First Trust Co.,* 160 Neb.

469, 474, 70 N.W.2d 466, 470-71 (1955).

It is equally well established that each case of this nature " 'is to be determined from the facts, circumstances, and conditions as presented therein.' " *Id.* at 475, 70 N.W.2d at 471. It is on the basis of these rules that we must now set forth to review the evidence presented by the parties to this action.

As noted earlier, the appellee alleges that during the last 10 years of the decedent's life, the decedent promised on numerous occasions that he would execute a will leaving the Layton Hardware Store and inventory to the appellee in return for the appellee's long and faithful service as an employee at that store. The evidence adduced by the appellee revealed that he had worked at the hardware store for 50 years and that the decedent had operated the store since 1948, having taken over the business from his father. During this period of time, the appellee stated he had been offered two other jobs, one following the end of World War II and the other in 1950, both of which he declined to accept. According to the appellee, the decedent became aware of these other offers and responded by promising the appellee that the store and the inventory would be his when the decedent reached the age of 65. It was the appellee's contention that he remained at the Layton Hardware Store, working 10 hours per day, 6 days a week, at what he felt were low wages, because of this promise. However, this promise apparently was altered several times prior to the death of the decedent.

In 1969, when the decedent turned age 65, the appellee said the decedent informed him that his wife was ill and that as long as she was in the nursing home, he, the decedent, would remain at the store. The appellee maintains that the decedent reiterated at this time that the appellee was still going to get the store and inventory. Upon the death of the decedent's wife in 1974, the appellee stated the decedent

informed him that he, the decedent, desired to remain at the store but that the store and inventory would be given to the appellee upon the decedent's death. The appellee testified that this last promise was reiterated by the decedent on several occasions after 1974. However, the appellee also noted that the decedent informed him in April 1978 that he would give the appellee the store but would sell him the inventory. The decedent made no further mention of the disposition of the store prior to his death on August 5, 1978.

While the record is replete with allusions to an "agreement" between the appellee and the decedent, the following statement by the appellee best sets forth the terms of any such "agreement" that might have existed: "Well, he [the decedent] agreed if I'd stay on, that's the agreement there, that he would give me the store and the stock if I would stay on and run the store for him." When asked to relate the manner in which he responded to the decedent's promises, the appellee admitted that he merely remained working at the store as he had been doing for years, and at no time did he verbally accept the offer. Although the appellee testified that he had told the decedent several times that he would remain working at the store, he admitted that these statements were not made in conjunction with the decedent's promises to leave him the store if he remained.

In an apparent attempt to support his contention that he had performed his portion of the "agreement," the appellee offered his wage and tax statements for the years of 1965 to 1977. During this period, the appellee's wages ranged from approximately $5,600 in 1965 to $10,700 in 1977, with annual raises of several hundred dollars. As noted, these wages were for a job at which the appellee worked 10 hours per day, 6 days a week, although the record also reveals that the appellee did not work on Thurs-

day afternoons. It is apparent from the appellee's statements on the stand that he considered these to be low wages and that it was implicit in the "agreement" between the appellee and the decedent that the gift of the store and inventory at some point would rectify the situation. However, the appellee was unable to point to a specific instance where the decedent had stated that the gift of the store and inventory was to be in lieu of higher wages.

In addition to his own testimony the appellee offered the testimony of six other persons who had been acquaintances of the decedent. Each witness testified about conversations he had had with the decedent between 1974 and his death in 1978 concerning the appellee and the disposition of the store. Three of these witnesses were only able to relate conversations in which the decedent is alleged to have spoken in broad terms concerning the disposition of the store. For instance, the decedent is alleged to have said that one day the appellee would "take over" and be the "main honcho" when the decedent was gone; or that one of these days the store would be the appellee's; or that the decedent desired to be able to take care of the appellee and would be able to following the death of his wife. However, none of these witnesses was aware of any agreement between the appellee and the decedent by which the appellee would "take over" or be "taken care of," and at least one witness conceded that for all he knew the appellee might have already owned the store at the time he had spoken with the decedent.

The remaining witnesses offered by the appellee were able to attest to the fact that the decedent had told them that he intended to "give" the store to the appellee at some point. However, one of the witnesses could not state the terms by which the appellee was to be "given" the store, and the other two witnesses gave conflicting accounts of the terms of the agreement.

The decedent's housekeeper testified that the decedent had informed her in February 1977 that he, the decedent, intended to give everything to the appellee. However, this witness also stated that the decedent had told her in February 1978 that the appellee would have to pay for the inventory but would be given everything else. Finally, a part-time employee testified regarding an agreement between the appellee and the decedent under which the "gift" of the store would be contingent upon the appellee getting the store's inventory "down to a reasonable or normal level."

With regard to the testimony of these six witnesses concerning conversations they had had with the decedent, we need remind ourselves that " 'Evidence of declarations of a deceased person, concerning a parol contract, does not amount to direct proof of the facts claimed to have been admitted by those declarations. Such evidence, when not supported by other evidence, is generally entitled to but little weight.' " *O'Neal v. First Trust Co.,* 160 Neb. 469, 474, 70 N.W.2d 466, 471 (1955). See, also, *Lunkwitz v. Guffey,* 150 Neb. 247, 34 N.W.2d 256 (1948); *Overlander v. Ware,* 102 Neb. 216, 166 N.W. 611 (1918). In this instance, the only evidence supporting the decedent's alleged declarations is the testimony of the appellee himself, as well as the fact that the decedent remained employed at the store for over 50 years.

Upon reviewing the evidence adduced by the appellee as set forth above, we can only conclude that the appellee has fallen short of carrying his burden of proof in several respects. As noted at the outset, the appellee bore the burden of proving by clear, satisfactory, and unequivocal evidence the existence of an oral contract and the terms thereof. This he has not done.

The evidence adduced by the appellee reveals not one but several agreements with varying terms un-

der which the appellee might have obtained ownership of the Layton Hardware Store. Initially, it is unclear whether the appellee is claiming that the store and inventory were to be his in return for his long and faithful service or merely as an inducement to encourage him to reject other offers of employment. It is equally unclear whether the appellee was to receive the store and inventory upon the decedent reaching the age of 65, or upon the death of the decedent's wife in 1974, or, finally, upon the death of the decedent in 1978. Finally, the evidence produced at trial leaves it uncertain whether the appellee was to be "given" the entire store, including the inventory, or whether the "gift" included only the store and the appellee would have to purchase the inventory, or, finally, whether the "gift" was contingent upon the appellee achieving a "reasonable or normal" level of inventory.

It can hardly be said that by offering such conflicting evidence the appellee has proved the clear, satisfactory, and unequivocal terms of an alleged oral contract to bequeath the Layton Hardware Store and its inventory to him at the decedent's death. " 'It is very proper that the assertion of such a contract, especially when it is claimed to be entirely in parol, should be regarded by the court with grave suspicion, and the establishment thereof required by evidence which clearly indicates the minds of the parties met upon the terms of the contract sought to be established.' " *Rudolph v. Hartung,* 202 Neb. 678, 683, 277 N.W.2d 60, 63 (1979). One can hardly say that the minds of the parties met upon the terms of an oral agreement when the record does not reveal with certainty what the terms of the alleged agreement were.

Furthermore, we are also unable to conclude that the appellee has shown that the acts alleged to have been performed under the agreement " 'were such as were referable solely to the contract sought to be

enforced . . . .' " *O'Neal v. First Trust Co., supra* at 474, 70 N.W.2d at 471. The following exchange between the appellee and his counsel is especially informative in this respect: "Q. . . . After you had these discussions with Mr. Layton that you talked about [discussions concerning the disposition of the store] did you do anything pursuant to these discussions? A. *No.* Q. Did you agree to do anything for Mr. Layton? A. *Not anymore than what I had been doing.* Q. Which is what? A. Working long hours." (Emphasis supplied.) We must note that the appellee continued to be compensated for his services following the making of the purported agreement and received annual raises in that compensation. There is not evidence in the record, other than the appellee's bare assertions, to indicate that the appellee was being undercompensated for the work he was doing. Consequently, the appellee has by his own admission made it impossible to distinguish between his performance rendered under his employment contract and his performance rendered under the alleged agreement at issue herein. We are unable to draw such a distinction and therefore must conclude that the appellee has failed to prove that his performance following the making of the alleged agreement was " 'not such as might have been referable to some other or different contract.' " *O'Neal v. First Trust Co., supra* at 474, 70 N.W.2d at 471. See, also, *Theobald v. Agee,* 202 Neb. 524, 276 N.W.2d 191 (1979).

We therefore conclude from a de novo review of the record that the appellee has failed to satisfy his burden of proof both as to the existence of any oral contract to make a will and as to his performance being solely referable to such alleged agreement. Accordingly, the judgment of the District Court is reversed and the action ordered dismissed.

REVERSED AND DISMISSED.